[Cite as *In re A.M.*, 2023-Ohio-1441.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

| | |
|---|---|
| IN THE MATTER OF:<br><br>A.M. AND A.M.,<br>DEPENDENT CHILDREN | CASE NOS. 2022-A-0107<br>2022-A-0108<br><br>Civil Appeals from the<br>Court of Common Pleas,<br>Juvenile Division<br><br><br>Trial Court Nos. 2018 JC 00136<br>2018 JC 00137 |

**O P I N I O N**

Decided: April 25, 2023
Judgment: Affirmed

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Christopher R. Fortunato,* Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Appellee, Ashtabula County Children Services Board).

*Mandy J. Gwirtz*, Gwirtz Law, LLC, 20050 Lakeshore Boulevard, Euclid, OH 44123 (For Appellant, Rebecca Henery).

*Carmen M. Hamper*, P.O. Box 2834, Ashtabula, OH 44005 (For A.M. and A.M.).

*Ariana E. Tarighati*, Law Offices of Ariana E. Tarighati, LPA, 34 South Chestnut Street, Suite 100, Jefferson, OH 44047 (Guardian ad Litem).

MARY JANE TRAPP, J.

{¶1} In this consolidated appeal, appellant, Rebecca Henery ("Ms. Henery"), appeals the judgment of the Ashtabula County Court of Common Pleas, Juvenile Division, overruling her objections to the magistrate's decision and granting permanent custody of

her two minor children to appellee, Ashtabula County Children Services Board ("ACCSB").

{¶2} Ms. Henery asserts one assignment of error, contending that the trial court erred by granting permanent custody of the children to ACCSB contrary to the manifest weight of the evidence.

{¶3} After a thorough review of the record and pertinent law, we find that clear and convincing evidence supported the trial court granting permanent custody to ACCSB. As a result, the trial court's judgment was not against the manifest weight of the evidence.

{¶4} Thus, we affirm the judgment of the Ashtabula County Court of Common Pleas, Juvenile Division.

## Substantive and Procedural History

{¶5} This matter involves the two minor children of Ms. Henery and Samuel Marshall, Jr. ("Mr. Marshall") who were born, respectively, in 2013 and 2016.

### *Emergency Temporary Custody*

{¶6} This matter began on July 27, 2018, when ACCSB received a hotline call at 3 a.m. indicating that the children were present at the home of a babysitter where the police had been called. Ms. Henery reported that she was intoxicated and unable to pick up the children. Mr. Marshall arrived by taxi but appeared to be intoxicated. ACCSB took emergency temporary custody of the children at the scene. The trial court filed an ex parte order granting emergency temporary custody of the children to ACCSB.

{¶7} On July 30, 2018, ACCSB filed a verified complaint for temporary custody, alleging neglect and dependency. The trial court held a shelter care hearing. Mr. Marshall and Ms. Henery appeared and stipulated to probable cause. The trial court continued

2

ACCSB's emergency temporary custody of the children. The court appointed a guardian ad litem ("GAL") for the children and counsel for Mr. Marshall and Ms. Henery.

{¶8} On August 15, 2018, ACCSB filed a case plan. The case plan stated that Mr. Marshall and Ms. Henery admitted to chronic alcohol use. There were concerns that it interfered with their parenting and that there was other substance abuse. The case plan required Mr. Marshall and Ms. Henery to maintain sobriety; to complete an age-appropriate parenting class; to complete drug and alcohol assessments, follow any and all recommendations, and comply with random screens; to complete mental health assessments and follow any and all recommendations; to obtain employment and provide proof of income; and to obtain adequate housing and provide proof of residency. Mr. Marshall was instructed to focus on "intimate partner violence."

### Adjudication and Disposition

{¶9} On August 28, 2018, the trial court held an adjudication hearing. Ms. Henery appeared with counsel. Mr. Marshall did not appear but was represented by counsel. The trial court adjudicated the children as dependent and dismissed the allegation of neglect.

{¶10} On September 25, 2018, the trial court held a disposition hearing. Mr. Marshall and Ms. Henery appeared and were represented by counsel. The trial court adopted the case plan and granted temporary custody of the children to ACCSB.

{¶11} On October 11, 2018, Ms. Henery, through counsel, filed a motion requesting the return of the children and for increased visitation. On January 24, 2019, the trial court held a semi-annual review hearing. Ms. Henery appeared with counsel. Mr. Marshall did not appear but was represented by counsel. The GAL reported that Ms.

3

Henery had made progress on her case plan, that she obtained separate housing from Mr. Marshall in Conneaut, and that she had completed weekend visits with the children. However, there were indications that Mr. Marshall had been violent, which caused Ms. Henery to leave her residence and stay with a friend. The GAL also reported that Mr. Marshall and Ms. Henery operated a business together on Main Avenue in Ashtabula. The trial court found that Ms. Henery's motion of October 11, 2018, was moot and prohibited Mr. Marshall from being present during her visitation time with the children.

{¶12} Ms. Henery moved into a house on Humphrey Avenue in Ashtabula. In March 2019, ACCSB placed the children in her care. According to ACCSB, however, the house presented a safety hazard due to electrical cords from an outside generator and the presence of multiple men associated with criminal activity.

### Extension of Temporary Custody

{¶13} On July 18, 2019, ACCSB filed a motion to extend temporary custody. On July 29, 2019, the trial court held a hearing on this motion and an annual review. Mr. Marshall and Ms. Henery were present and represented by counsel. ACCSB reported that the children were currently residing with Ms. Henery on a trial basis but that it maintained temporary custody. Ms. Henery agreed with ACCSB's request to extend temporary custody for six months so that she could work on her case plan. Mr. Marshall also agreed to the extension, indicating that although he was not complying with his case plan, he was supportive of Ms. Henery's efforts to regain custody. Upon Ms. Henery's request, the trial court vacated its prior order prohibiting Mr. Marshall from being present during her visitation time with the children.

4

Case Nos. 2022-A-0107, 2022-A-0108

{¶14} After repeated requests from ACCSB, Ms. Henery agreed to move into an apartment at Beatitude House in Ashtabula and was put on a waiting list. In August 2019, Ms. Henery and the children stayed with Mr. Marshall at the Main Avenue store for a few days. ACCSB arrived, removed the children from Ms. Henery's care, and placed them in foster care.

{¶15} On October 29, 2019, the trial court held a review hearing. Mr. Marshall and Ms. Henery did not appear but were represented by counsel. The GAL reported that Ms. Henery had completed a parenting class but had been inconsistent with her mental health treatment. Courtney Santiago ("Ms. Santiago"), the parents' ACCSB caseworker, reported that Mr. Marshall had not completed the parenting class or substance abuse treatment requirements and that he and Ms. Henery appeared to be residing in the Main Avenue store. All prior orders were maintained, and the children remained in the temporary custody of ACCSB.

{¶16} On January 9, 2020, ACCSB filed a second motion to extend temporary custody. On February 12, 2020, the trial court held a hearing on the motion. Mr. Marshall did not appear but was represented by counsel. Ms. Henery appeared late, after the presentation of evidence. Ms. Santiago testified that Ms. Henery was officially residing at Beatitude House; however, on several occasions when Ms. Santiago attempted to visit, Ms. Henery was not present. On multiple occasions, Ms. Santiago observed Ms. Henery's vehicle at the Main Avenue store. In fact, the parents were involved in an argument in front of that location at 6 a.m. that morning. Ms. Henery had also missed multiple appointments for her mental health treatment. Ms. Santiago further testified that Mr. Marshall had attended a recent counseling appointment; he was employed at a

5

factory; and he was residing in the Main Avenue store. The trial court extended temporary custody for a six-month period.

{¶17} On April 14, 2020, the GAL filed a motion to suspend visitation. Ms. Henery had arrived unexpectedly at the home of the children's foster family on Easter evening, entered the screened-in porch, and would not leave. The trial court granted the GAL's motion and held a hearing on April 29, 2020. Ms. Henery was present via audio and was represented by counsel. Mr. Marshall did not appear but was represented by counsel. The GAL withdrew her motion, and Ms. Henery was ordered to have no direct or indirect contact with the foster family.

{¶18} On April 21, 2020, one of Ms. Henery's neighbors at Beatitude House called the police. According to the police report, Mr. Marshall discovered that Ms. Henery had male company, opened her window, and began shoving items off the ledge while yelling. On another occasion, Beatitude House prohibited a different male friend from visiting Ms. Henery because of his alleged criminal activity.

### *Permanent Custody*

{¶19} On June 4, 2020, ACCSB filed a motion to modify its temporary custody to permanent custody.

{¶20} In August 2020, at the GAL's request, the trial court appointed counsel for the children based on the possibility that the GAL's recommendation may conflict with the children's wishes. The GAL subsequently filed two reports recommending that the trial court grant permanent custody to ACCSB.

{¶21} Following three continuances (two requested by Ms. Henery and one requested by ACCSB), the magistrate held an evidentiary hearing on April 14, 2021.

6

ACCSB presented testimony from Captain Stephen Chase ("Capt. Chase") from the Ashtabula Fire Department (over the parents' objections); Attorney Jane Hawn Jackson, who previously served as the GAL; Ms. Henery; and Ms. Santiago. Ms. Henery testified on her own behalf and presented exhibits. Mr. Marshall presented no witnesses or evidence. The children's foster mother made an unsworn statement, and the GAL's reports were admitted.

{¶22} Capt. Chase testified that the Main Avenue property was previously used by an insurance business. In 2018, he discovered it was filled with combustible materials, debris, trash, and extension cords. In 2019, he found evidence that the property was being used as a residence and took steps to have it ordered vacated. Despite these efforts, he observed Mr. Marshall and Ms. Henery on the property on multiple occasions. He informed Mr. Marshall during several conversations that he could not be there. In 2020, he again observed residential evidence at the property and took steps to have the electricity shut off. In 2021, the property was badly damaged in a fire, which the department determined had been intentionally set.

{¶23} Ms. Santiago testified that prior to June 2020 when the ACCSB filed its motion for permanent custody, Ms. Henery was not compliant with her case plan. Although Ms. Henery was officially residing at Beatitude House, Ms. Santiago only found her present at the residence during three out of ten visits. In addition, Ms. Henery was charged with felony burglary for the incident when she appeared unannounced at the foster family's home and was required to participate in mental health court. Ms. Henery also did not maintain steady employment or provide proof of income.

7

{¶24} After June 2020, Ms. Henery was compliant with her mental health and substance abuse treatment requirements; she had obtained suitable housing through the Ashtabula Metropolitan Housing Authority ("AMHA"); and she was receiving unemployment compensation and child support; however, certain issues remained. Ms. Henery still did not maintain steady employment. In August 2020, Ms. Henery tested positive for amphetamines and methamphetamines, and she refused to submit to a hair screen for the purpose of detecting ongoing drug use. Ms. Henery was also observed at Mr. Marshall's residence within the last 30 days and recently reported to the police that he "stabbed" the tire of her male friend's vehicle and left a note on her doorstep.

{¶25} Prior to June 2020, Mr. Marshall was not compliant with his case plan. He did not complete his parenting class or anger management class requirements; maintain steady employment; provide proof of income for the Main Avenue business; maintain suitable housing; or follow substance abuse treatment recommendations. After June 2020, Mr. Marshall moved into a new apartment but remained noncompliant with his other requirements. He tested positive for amphetamines and methamphetamines at the same time as Ms. Henery and also refused to submit to a hair screen.

{¶26} Ms. Santiago also testified that prior to the pandemic, Mr. Marshall and Ms. Henery had supervised in-person visits with the children for one hour each week. Ms. Henery missed one of those visits. During the pandemic, the visits were virtual, and Mr. Marshall and Ms. Henery missed approximately half of them. Both interacted inappropriately at times during their visits by discussing the custody case.

{¶27} The children's foster mother stated that she had served in that capacity since August 27, 2019. Since that time, the children have experienced a stable and

8

secure environment. The children do well in school, have many friends, and enjoy playing several sports. She has enrolled the children in counseling services. She stated that it is heartbreaking when Mr. Marshall and Ms. Henery do not show up for confirmed visits with the children. She indicated that she would like to provide a permanent home for the children and to provide ongoing contact with their biological parents and other relatives.

{¶28} During her testimony, Ms. Henery denied ever having a problem with alcohol or being a methamphetamine user. She also disputed the accuracy of the August 2020 positive drug test and stated that she obtained a hair screen of her own volition in late October 2020 and tested negative.

{¶29} Following the presentation of evidence, the magistrate heard argument from counsel. Relevant here, the children's counsel requested that ACCSB's motion be denied, arguing that ACCSB failed to meet its burden to show that the children cannot or should not be placed back in the home of either parent and that granting permanent custody to ACCSB is in the best interest of the children.

{¶30} On July 8, 2021, the magistrate filed a decision granting ACCSB's motion for permanent custody. It found, by clear and convincing evidence, that the children had been in ACCSB's temporary custody for a minimum of 12 out of the past 22 consecutive months; that ACCSB made reasonable efforts to prevent the removal of the children from their home, to eliminate the continued removal of the children from their home, or to make it possible for the children to return safely home; and that granting ACCSB's motion for permanent custody would serve the children's best interest.

{¶31} On July 16, 2021, the trial court filed a judgment entry approving and adopting the magistrate's decision and granting ACCSB's motion for permanent custody.

9

Mr. Marshall and Ms. Henery both filed objections to the magistrate's decision, and Ms. Henery later filed supplemental objections following the filing of the hearing transcript.

{¶32} On October 14, 2022, the trial court filed a judgment entry overruling the parties' objections to the magistrate's decision and granting permanent custody of the children to ACCSB.

{¶33} Ms. Henery filed two notices of appeal, which this court sua sponte consolidated for all purposes.[1] She raises the following assignment of error:

{¶34} "The trial court erred by granting permanent custody of [the children] to the Ashtabula County Children Services Board contrary to the manifest weight of the evidence."

## Standard of Review

{¶35} It is well established that a parent's right to raise a child is an essential and basic civil right. *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). The permanent termination of parental rights has been described as "'the family law equivalent of the death penalty in a criminal case.'" *Id.*, quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991). Based upon these principles, the Supreme Court of Ohio has determined that a parent must be afforded every procedural and substantive protection the law allows. *Id.*

{¶36} While the rights of a parent to his or her child are fundamental, they are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed. *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034

---

1. Mr. Marshall also filed two notices of appeal, which we consolidated. We affirmed the trial court's judgment in relation to Mr. Marshall in *In re A.M.*, 11th Dist. Ashtabula Nos. 2022-A-0090 and 2022-A-0091, 2023-Ohio-671.

Case Nos. 2022-A-0107, 2022-A-0108

(1979). Although the termination of the rights of a natural parent should occur as a last resort, termination is expressly authorized when necessary for the welfare of the child. *In re L.M.R.*, 11th Dist. Lake No. 2016-L-096, 2017-Ohio-158, ¶ 33.

**{¶37}** The trial court must apply a two-pronged analysis when ruling on a motion for permanent custody. *In re Krems*, 11th Dist. Geauga No. 2003-G-2535, 2004-Ohio-2449, ¶ 33. The trial court may grant permanent custody of a child to the movant if the court determines at the hearing, by clear and convincing evidence, that one of the factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies and that it is in the best interest of the child. R.C. 2151.414(B)(1).

**{¶38}** "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re Krems* at ¶ 36. "[C]lear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Id*. "Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof." *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985).

**{¶39}** Ms. Henery contends that the trial court's judgment is against the manifest weight of the evidence. "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed. 1990). "A trial court's judgment terminating parental

11

rights and awarding permanent custody to an agency will not be reversed as against the manifest weight of the evidence if it is supported by clear and convincing evidence." *In re Belanger*, 11th Dist. Ashtabula No. 2002-A-0047, 2002-Ohio-4956, ¶ 17.

## The Children's Best Interest

{¶40} Ms. Henery sole assignment of error challenges the second prong of the permanent custody analysis, i.e., the trial court's determination that it was in the children's best interest to grant permanent custody to ACCSB.

{¶41} In determining the best interest of a child, the trial court shall consider all relevant factors, including, but not limited to, those set forth in R.C. 2151.414(D)(1)(a) through (e). R.C. 2151.414(D)(1). "The statute requires a weighing of all the relevant factors * * *." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 64. "No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

### *The Children's Interactions/Interrelationships*

{¶42} R.C. 2151.414(D)(1)(a) requires the trial court to consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child[.]"

{¶43} According to Ms. Henery, the evidence showed that the children were bonded to her, while the magistrate incorrectly found that the ACCSB caseworker was not able to observe this bond.

{¶44} Ms. Henery mischaracterizes the magistrate's finding. The magistrate expressly found that "[t]he minor children are bonded to Mother and Father." However,

12

the magistrate noted that the parents' visits have not progressed past *supervised* visits due to their lack of case plan progress. Similarly, in considering the factor in R.C. 2151.414(D)(1)(d), the magistrate stated that "neither the ACCSB caseworker nor the [GAL] have been able to observe Mother or Father interact with the minor children in a live and *unsupervised* fashion because of the lack of progression on the Case Plan." Thus, contrary to Ms. Henery's assertion, the magistrate did not find a lack of *bonding* or visitation. The magistrate found a lack of *unsupervised* visitation—a fact that cannot reasonably be disputed.

{¶45} Ms. Henery also fails to acknowledge the magistrate's additional findings under this factor, including that the children are residing together in their foster mother's care where all of their needs are being met; the older child is thriving in foster care and is excelling in school; the children are bonded to their foster mother; the children regularly attend counseling; the parents' virtual visits during the pandemic have been highly inconsistent and, at times, inappropriate; and the parents' statements and unkept promises during virtual visits have negatively affected the children. These findings are supported by substantial competent, credible evidence in the record.

### *The Children's Wishes*

{¶46} R.C. 2151.414(D)(1)(b) requires the trial court to consider "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child[.]"

{¶47} Ms. Henery contends that the trial court "ignore[d] this factor" because the children told the GAL that they wanted to return to their mother.

13

**{¶48}** We disagree with Ms. Henery's assertion. The magistrate found that the children, who were eight and four years old, "are too young to express their wishes independently" but that "the children's wishes were expressed through the report, recommendation, and testimony of the Guardian ad Litem, and arguments of counsel." The GAL's report indicates that both children stated they wished to remain with their foster mother and, alternatively, that they wished to live with their parents. The children's separate counsel participated in the permanent custody hearing and argued against granting permanent custody to ACCSB. Thus, the trial court fulfilled its statutory duty to *consider* the children's wishes.

### The Children's Custodial History

**{¶49}** R.C. 2151.414(D)(1)(c) requires the trial court to consider "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *[.]"

**{¶50}** The magistrate found that ACCSB obtained temporary custody of the children on July 27, 2018; ACCSB placed the children in Ms. Henery's care for a period of time while it maintained temporary custody; ACCSB removed the children from Ms. Henery's care when it discovered she had stayed with them at the Main Avenue property where documented safety hazards existed; the children have been in their current placement since August 27, 2019; and the children have been in ACCSB's temporary custody for over 21 months out of a consecutive 22-month period. Ms. Henery does not challenge these findings on appeal.

14

### Legally Secure Permanent Placement

**{¶51}** R.C. 2151.414(D)(1)(d) requires the trial court to consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]"

**{¶52}** According to Ms. Henery, she substantially remedied the conditions that caused the children's removal, which she demonstrated through her case plan compliance.

**{¶53}** The evidence establishes that prior to June 2020, Ms. Henery was not compliant with her case plan in several respects. While she began to substantially comply, this occurred well after ACCSB filed its motion for permanent custody, at which time the children had been in ACCSB's temporary custody for well over 12 of 22 consecutive months. As this court has explained, the 12 out of 22-month criterion "provides a parent with ample opportunity to demonstrate his or her parenting fitness." *In re A.J.*, 11th Dist. Trumbull No. 2010-T-0041, 2010-Ohio-4553, ¶ 45. "'If the child has been placed in a children services agency's temporary custody for at least twelve months of the prior twenty-two months, some reason must exist why the child has not been in the parent's care. The reason normally would be because the parent has been unable to demonstrate that the parent is able, suitable, or fit to care for the child.'" *Id.* at ¶ 42, quoting *In re Workman*, 4th Dist. Vinton No. 02CA574, 2003-Ohio-2220, ¶ 39.

**{¶54}** In addition, Ms. Henery's substantial compliance after June 2020, by itself, is not dispositive. "[T]he dispositive issue is not whether a parent has complied with the case plan, but whether the parent has substantially remedied the conditions that led to the children's removal." *In re R.A.D.*, 1st Dist. Hamilton Nos. C-200325 et al., 2021-Ohio-

15

372, ¶ 21.  "A parent's compliance with the case plan does not preclude a trial court from awarding custody to a children-services agency, as long as it is in the child's best interest."

{¶55}  Here, the magistrate found that Ms. Henery had *not* remedied the concerns that were the basis for the children's removal.  Rather than maintaining sufficient stability to alleviate ACCSB's concerns, Ms. Henery demonstrated ongoing instability in the areas of employment and income, housing, substance abuse, and her relationship with Mr. Marshall.  In addition, for over two years, Ms. Henery had not interacted with the children in an *unsupervised* fashion due to her behavior and actions.  The magistrate's findings are supported by substantial competent, credible evidence in the record.

{¶56}  It appears the trial court assigned little weight to the evidence Ms. Henery submitted at the permanent custody hearing; however, issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact.  *In re D.H.*, 11th Dist. Ashtabula No. 2017-A-0081, 2018-Ohio-630, ¶ 18.  This is because the trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page."  *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

{¶57}  Further, a review of Ms. Henery's evidence does not compel a contrary conclusion.  For instance, Ms. Henery submitted an exhibit indicating she had maintained a residence in Conneaut since July 2020; however, as the magistrate noted, Ms. Henery's submitted pay stubs for the same time period listed her residence as Beatitude House in Ashtabula and later a different address in Conneaut.  Therefore, the magistrate reasonably concluded that Ms. Henery's housing remained unstable.  In addition, the transcript of Ms. Henery's testimony suggests she sought to minimize or rationalize the

16

evidence in the record regarding her past behavior and volatile relationship with Mr. Marshall. Therefore, the magistrate may have reasonably concluded that Ms. Henery's testimony lacked credibility.

### *Other Factors*

**{¶58}** Finally, R.C. 2151.414(D)(1)(e) requires the trial court to consider "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." The magistrate found no applicable factors under these subsections, and Ms. Henery does not challenge this finding on appeal.

**{¶59}** In sum, we find that clear and convincing evidence supported the trial court granting permanent custody to ACCSB. Therefore, the trial court's judgment was not against the manifest weight of the evidence.

**{¶60}** Ms. Henery's sole assignment of error is without merit.

**{¶61}** For the foregoing reasons, the judgment of the Ashtabula County Court of Common Pleas, Juvenile Division, is affirmed.


JOHN J. EKLUND, P.J., concurs,

MATT LYNCH, J., dissents with a Dissenting Opinion.


_____


MATT LYNCH, J., dissents with a Dissenting Opinion.

**{¶62}** It is a commonplace in permanent custody proceedings to recognize the termination of a parent's rights as the "family law equivalent of the death penalty in a criminal case." *Supra* at ¶ 35. What is not so commonplace is an insistence that the

17

evidence supporting the termination of a parent's rights be commensurate with the rhetoric regarding such decisions. Once it is demonstrated that a child has been in the temporary custody of a children services agency for twelve or more months of a twenty-two-month period, it is only a question of the child's best interest before the metaphorical ax falls. Notably, the integrity of the family unit has been found an "essential" right for the purposes of the Due Process Clause but is not explicitly recognized as a factor affecting a child's best interests. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.E.2d 551 (1972). In the present case, the evidence falls far short of demonstrating that Henery has done or failed to do anything approximating a capital crime. Essentially, Ashtabula Children Services justifies the termination of her parental rights because it is uncomfortable with her behavior, rather than for any specific or concrete deficiency in Henery's ability to parent. Regardless of the legitimacy of these concerns, they do not justify the sentence of execution.

{¶63} Certain matters should be set forth in the beginning because they are not evident in the lower court's or the majority's decisions. These children have never been abused either physically or psychologically. While in Henery's custody, they have never been without food, shelter, or proper medical care. There is scant evidence of domestic violence between Henery and Marshall and just as little evidence that the children were ever exposed to it.

{¶64} The majority identifies the following concerns/goals at the time of the children's removal in August 2018: chronic alcohol and other substance abuse; take a parenting class; complete drug and alcohol assessments; complete mental health assessment; and obtain adequate housing and employment. *Supra* at ¶ 8.

18

**{¶65}** Most of these concerns have not been issues for Henery during the pendency of this case. She took the parenting class early in the case. She worked throughout the pendency of the case and only recently, after the filing of the motion for permanent custody, did she go on unemployment. The uncontradicted evidence is that she is presently working with the Community Counseling Center to obtain employment. As noted above, she has never been homeless or without food or without means of support.

**{¶66}** Henery underwent an alcohol assessment early in this case. There is no evidence that she failed to comply with any recommendation with respect to alcohol. There is no evidence that alcohol has been an issue for Henery during the pendency of this case.

**{¶67}** The same is true with regard to drug abuse. Henery underwent an initial assessment and did not meet the criteria for substance dependency. She submitted to drug screens through Signature Health. From August 2018 until August 2020, the results were negative. In August 2020, she tested positive for amphetamine and/or methamphetamine. Since August 2020, the results have been negative. Henery disputes the positive August 2020 result and subsequently submitted to a hair follicle drug screen which came back negative and so contradicts the August screen. Regardless of whether the August 2020 screen was valid, it was the only positive test during the pendency of this case. There is no diagnosis of opiate dependency and no evidence of such dependency apart from a single test result. Stated otherwise, none of the behaviors Children Services finds concerning has ever been attributed to alcohol or drug abuse.

19

{¶68} The situation with respect to housing is more complicated but hardly an impediment to reunification. From the end of 2018 through June 2019, Henery resided on Buffalo Street in Conneaut. In March 2019, the children were returned to Henery at the Conneaut residence. As noted by the majority, Children Services maintained legal custody although the children were entrusted to Henery full-time.

{¶69} In June 2019, Henery and the children moved to a house owned by a Kelly Burke on Humphrey Avenue in Ashtabula. The caseworker, Santiago, did not approve of the Ashtabula residence: "The house was being run by a generator" and there were "electrical cords running from [the] generator outside into the house" which made her "very nervous about the children remaining in that home." Additionally, the caseworker was concerned about "multiple men in and out of that home." The caseworker noted that they were not cooperative in identifying themselves and at least some of them had a criminal record. No further details were given about these multiple men. Despite these concerns, the children were allowed to remain with Henery at the Humphrey Avenue residence.

{¶70} At the caseworker's urging, Henery agreed to relocate to a place called Beatitude House. She made arrangements to move there in August 2019. That same month, the children were again removed from her custody after Children Services learned that she and the children had stayed at a commercial property on Main Avenue in Ashtabula where Marshall was living. It is suggested that Henery and the children resided on Main Avenue but there is little evidence to confirm it. Henery herself admitted she and the children stayed there for three nights after vacating the Humphrey Avenue residence and before she could move into the Beatitude House. Beyond this admission, the only

20

evidence of an extended residence is that her car was often found parked at the commercial property. It was also undisputed, however, that Henery and Marshall operated a business out of this commercial property. The children were never found or witnessed being at this property.

{¶71} Henery resided at the Beatitude House from November 2019 to about July 2020 when she obtained public housing in Conneaut. Children Services did not have any issues with the Beatitude House or public housing. To put the evidence in perspective, Henery has had suitable housing for the children since November 2019, i.e., seven months prior to the filing of the permanent custody motion and for an additional ten months until the motion was heard.

{¶72} With respect to her mental health, Henery underwent an assessment early in the case and was initially compliant with attending counseling. At some point she missed appointments. The caseworker indicated that there might have been an issue with insurance. Henery indicated that there have been issues with the turnover of counselors at Signature Health (she is currently on her fourth counselor). There was an incident at Easter 2020 when Henery came to the house of the children's foster parent, apparently to deliver Easter baskets, and was charged with felony burglary. The case was diverted to mental health court. There are no current problems with Henery addressing her mental health issues (primarily adjustment disorder).

{¶73} This is the record on which the majority concludes that "Henery demonstrated ongoing instability in the areas of employment and income, housing, substance abuse, and her relationship with Mr. Marshall." *Supra* at ¶ 55. The evidence scarcely supports these claims under a preponderance of the evidence standard, much

21

less the clear and convincing evidence standard which must be met before the permanent termination of parental rights may be considered. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 12-13 ("[b]efore parental rights are terminated and permanent custody granted to a children services agency, R.C. 2151.414(B)(1) requires a court to determine 'by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that * * * the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents'").

{¶74} The majority also claims that, "for over two years, Ms. Henery had not interacted with the children in an *unsupervised* fashion due to her behavior and actions." *Supra* at ¶ 55. Yet the children were allowed to remain in Henery's custody for six months during this period. While Children Services retained legal custody, it is not the case that the children were under constant supervision. There were visits from the caseworker but otherwise Henery's custody was unsupervised. There were concerns with the Humphrey Avenue residence, but they did not justify the children's removal. In any case, Henery voluntarily vacated that residence after a few months. Beyond this, one wonders exactly what "behavior and actions" by Henery prevented her from enjoying unsupervised visitation? The nights spent at the commercial property (which has not been an issue since August 2019)? The Easter incident (despite the magistrate finding "Mother has been compliant with her mental health needs and currently * * * is actively engaged in Mental Health Court")? A single, dubious drug screen (which occurred after the permanent custody motion was filed)?

22

{¶75} What, then, justifies permanent termination of Henery's parental rights? That question was asked by the attorney for Children Services of the caseworker: "If housing is not the issue, what is the issue in your mind?"

> The issue is the frequent behavior concerns and irrational behaviors, and the ongoing fighting, arguments, domestic violence between the two parties. * * * [D]uring some of my visits with mom * * * I would speak to mom and halfway through a conversation she would just * * * get up and walk out of the conversation. She would often say I need to go take a nap. Just irrational behavior. * * * The other concerning behaviors was [sic] I tried to explain that the safety factor of the children being in a home with the multiple men that were present when I arrived there, and that it's a safety factor for the children. And she dismissed it.

Permanent custody hearing transcript at 244. Neither the magistrate nor the majority cited this testimony in support of the termination of parental rights. If this testimony accurately reflects the concerns or issues with Henery's parenting, the motion should not have been granted.

{¶76} The foregoing is not meant to belittle the efforts of Children Services or to deny that Henery has benefited from those efforts. It may be that the foster parent can provide a more stable home or life or financial security for the children. However, these are not the criteria by which a bonded family unit should be dissolved. There is a serious lack of "clear and convincing" evidence that Henery is fundamentally unfit as a parent or unable to care for her children. In the absence of such evidence, I cannot concur in the decision to permanently terminate her parental rights and, accordingly, I respectfully dissent.

23